## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND and LABORERS' WELFARE FUND OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, and JAMES S. JORGENSEN, Administrator of the Funds, | ) ) ) ) ) ) ) | Case No. 09 CV 1234 |
| | ) | Judge Hart |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CORPORATE CONSTRUCTION, INC., an Illinois Corporation | ) ) ) | |
| Defendants. | ) | |

## MOTION FOR ENTRY OF JUDGMENT IN SUM CERTAIN

Now come Plaintiffs Laborers' Pension Fund and Laborers' Welfare Fund of the

Health and Welfare Department of the Construction and General Laborers' District

Council of Chicago and Vicinity and James S. Jorgensen, Administrator of the Funds

(collectively referred to hereinafter as the "Funds"), by and through their attorney, John

Hamada, and hereby move this Court to enter Judgment in Sum Certain against

Defendant Corporate Construction, Inc. (hereinafter the "Company"). In support of this

Motion, Plaintiffs state as follows:

1.      Plaintiffs filed their Complaint on February 26, 2009 seeking to compel

the Company to obtain and maintain a surety bond, to submit benefits and dues reports

and contributions for the period of November 2008 forward; liquidated damages and

interest on the foregoing reports, and attorneys' fees and costs

2.     On October 29, 2009, this Court found the Company in default, and
ordered the Company to submit its reports and contributions for the period of April 2009
forward, liquidated damages and interest on the foregoing reports, and attorneys fees and
costs.

3.     The Company represented to the Funds that it was no longer in business,
and agreed to submit its books and records to a close-out audit pursuant to this lawsuit to
determine benefits and dues contribution compliance.  The Company submitted its
records to an audit for the period of January 1, 2007 through March 31, 2009.

4.     As set forth in the Affidavit of Joe Gilleran, filed contemporaneously
herewith and attached hereto as Exhibit A, pursuant to the Agreement, and the Funds'
respective Agreements and Declarations of Trust and the audit conducted of Defendant's
books and records for the periods of January 1, 2007 through March 31, 2009, the Funds
are entitled to the audit costs in the amount of $912.25.  See Exhibit A, ¶ ¶ 1 through 5.

5.     Pursuant to Section 502(g)(2) of the Employee Retirement Income
Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor
Management Relations Act ("LMRA"), as amended, 29 U.S.C. §185, the Agreement, the
Funds' respective Agreements and Declarations of Trust, and Federal Common Law, the
Funds are entitled to judgment in the amount of $7,753.05 against the Company, as
follows:

        a.     $912.25 in audit costs for the audit conducted of the Company's
books and records for the period of January 1, 2007 through March
31, 2009; and

        b.     $6,840.80 in attorneys' fees and costs as set forth in the

Declaration of John Hamada filed contemporaneously herewith and attached hereto as Exhibit B.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in Plaintiffs' favor and against Defendant Corporate Construction, Inc., in the amount of $7,735.05, as follows:

A.  $912.25 in audit costs for the audit conducted of the Company's books and records for the period of January 1, 2007 through March 31, 2009; and

B.  For $6,848.80, representing attorneys' fees and costs.

C.  Ordering Defendant to pay post judgment interest in all amounts due from the date of judgment until the judgment is satisfied.

April 18, 2011                             Laborers' Pension Fund, et al.

                                           By: /s/ John Hamada

John Hamada
Office of Fund Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL 60604
(312) 692-1540

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND and<br>LABORERS' WELFARE FUND OF THE<br>HEALTH AND WELFARE DEPARTMENT<br>OF THE CONSTRUCTION AND GENERAL<br>LABORERS' DISTRICT COUNCIL OF<br>CHICAGO AND VICINITY, and JAMES S.<br>JORGENSEN, Administrator of the Funds,<br><br>Plaintiffs,<br><br>v.<br><br>CORPORATE CONSTRUCTION, INC., an<br>Illinois Corporation<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 09 CV 1234**<br><br>**Judge Hart** |

### AFFIDAVIT OF JOE GILLERAN

JOE GILLERAN, being first duly sworn on oath, deposes and states as follows:

1.      I am a Field Representative employed by the Laborers' Pension Fund and the Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in the above-referenced action. My responsibilities include oversight of the collection of amounts owed by Defendant Corporate Construction, Inc. (hereinafter "the Company"). This Affidavit is submitted in support of the Laborers' Funds' Motion for Entry of Judgment in Sum Certain. I have personal knowledge regarding the statements contained herein.

2.      On July 21, 2006, the Company signed an Independent Construction Industry Collective Bargaining Agreement ("Agreement") with the Construction and General Laborers' District Council of Chicago and Vicinity, and Laborers' Local 152. A



EXHIBIT
A

true and accurate copy of the Agreement is attached hereto as Exhibit A-1. Pursuant to the terms of the Agreement, the Company is bound to the terms of the relevant collective bargaining agreement "Collective Bargaining Agreement" incorporated by reference in the Agreement and the Funds' respective Agreements and Declarations of Trust.

3.     Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the District Council.

4.     The Agreement and the Funds' respective Agreements and Declarations of Trust to which the Company is bound require that the Company submit benefit reports and contribution payments by the tenth day of the following month. Payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 20 percent of the principal amount of delinquent contributions, and interest at a rate of prime plus 2 percent as charged by JPMorgan Chase Bank from the date of delinquency forward. The Agreement requires that the Company submit dues reports and dues by the tenth day of the following month. Payments which are not received by this date are assessed liquidated damages in the amount of 10 percent of the principal amount of delinquent dues. A copy of the relevant portions of the Agreement is attached as Exhibit A-2; a copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund is attached as Exhibit A-3; a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council is attached as Exhibit A-4, and a copy of the relevant portions of the Agreement and Declaration of Trust Establishing the Construction and General Laborers' District Council of Chicago and Vicinity Training Trust Fund is

2

attached as Exhibit A-5.

5.      An audit of the Company's books and records was conducted for the period of January 1, 2007 through December 31, 2009. A true and accurate copy of the audit is attached hereto as A-6. The audit revealed no liability for benefits contributions or dues. The cost of the audit conducted for the period of January 1, 2007 through December 31, 2009 was $912.25. A true and accurate copy of the Invoice for professional services rendered is attached hereto as Exhibit A-7.

FURTHER AFFIANT SAYETH NAUGHT.

Joe Gilleran

Subscribed and sworn before me
This 18th day of April, 2011.

Notary Public

"OFFICIAL SEAL"
EUGENIA MASHOS
Notary Public, State of Illinois
My Commission Expires 09/12/12

3

# INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between_ _____,
("Employer") and the Construction and General Laborers' District Council of Chicago and Vicinity,
Laborers' International Union of North America ("Union"), representing and encompassing its
affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269,
288, 582, 681, 1001, 1035, 1092, together with any other Local Unions that may come within the
Union's jurisdiction ("Local Union"), and encompassing the geographic areas of Cook, Lake,
DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone counties, Illinois, that:

1.    Recognition. The Employer recognizes the Union as the sole and exclusive collective
bargaining representative for the employees now and hereinafter employed in the Laborer bargaining
unit with respect to wages, hours and other terms and conditions of employment. If majority
recognition previously was established under Section 9(a) of the Act, it shall remain in effect.
Otherwise, recognition under Section 9(a) of the Act shall automatically be granted to the Union
without the need for a Board certified election upon the Union's demonstration that a majority of the
employees have designated the Union as their exclusive bargaining representative. The Employer
has not assigned its rights for purposes of collective bargaining with the Union to any person, entity
or association, and hereby revokes its prior assignment of bargaining rights, if any. The Employer
further voluntarily elects not to assign such bargaining rights to any person, entity or association
during the term of this Agreement or any extension thereof, without written approval from the
Union. The Employer shall abide by this Agreement, and extensions hereof, provided that it
employs at least one Laborer during the term of this Agreement.

2.    Labor Contract. The Employer affirms and adopts the applicable Collective Bargaining
Agreements, as designated by the Union, between the Union and the Concrete Contractors
Association of Greater Chicago, G.D.C.N.I/C.A.W.C.C., the Chicago Demolition Contractors'
Association, the Illinois Environmental Contractors Association, the Chicago Area Rail Contractors
Association, the Chicago Area Scaffolding Association, the Chicago Area Independent Construction
Association, and all other employer associations with whom the Union or its affiliated Local Unions
has an agreement. If the applicable collective bargaining agreement(s) expire during the term of this
Agreement, any limitation on the right to strike shall also expire until a new agreement has been
established, which shall be incorporated retroactively herein. It is further agreed that where the
Employer works within the geographic jurisdiction of the Union's affiliated Local Unions that have
negotiated an association agreement effective within the Local Union's jurisdiction, then the Local
Union agreement is herein specifically incorporated into this Agreement and shall supersede the
area-wide standard association agreements within the locality for which it is negotiated in the case of
any conflict between them. Notwithstanding the foregoing, this Agreement supercedes all contrary
terms in either the Local Union or area-wide association agreements.

3.    Total economic increase. The Employer shall pay its employees a total economic
increase of $2.90 per hour effective June 1, 2006; $3.00 per hour effective June 1, 2007; $3.00 per
hour effective June 1, 2008 and $3.10 per hour effective June 1, 2009, said amounts to be allocated
between wages, fringe benefits and other funds by the Union in its sole discret'-



4.     Dues Checkoff.  The Employer shall deduct from the wages of employees uniform working dues in the amount of 1.75% of gross wages, or such other amount as directed by the Union, and shall remit monthly to the designated Union office the sums so deducted, together with an accurate list-showing the employees from whom dues were deducted, the employees' individual hours, gross wages and deducted dues amounts for the monthly period, not later than the tenth (10th) day of the month following the month for which said deductions were made.  It is the parties' intention that these deductions comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and such deductions be made only pursuant to written assignments from each employee on whose account such deductions are made, which shall not be irrevocable for a period of more than one year or beyond the termination date of the labor agreement, whichever occurs sooner.

5.     Work Jurisdiction.  This Agreement covers all work within the Union's work jurisdiction as set forth in the Union's Statement of Jurisdiction, receipt of which is hereby acknowledged, and as amended by the Union from time to time.  The Statement of Jurisdiction is incorporated by reference into this Agreement.  The Employer shall assign all work described therein to its Union-represented Laborer employees and acknowledges the appropriateness of this assignment.  Neither the Employer nor its work assignments as required under this Agreement shall be stipulated or otherwise subject to adjustment by any jurisdictional disputes board or mechanism except upon written notice by and direction of the Union.  The Employer, whether acting as a contractor, general manager or developer, shall not contract or subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work and coming within the above-described jurisdiction of the Union to any person, corporation or entity not signatory to and covered by a collective bargaining agreement with the Union.  This obligation applies to all tiers of subcontractors performing work at the site of construction.  When the Employer contracts out or sublets any of the work coming within the above-described jurisdiction of the Union, it shall assume the obligations of any such subcontractor for prompt payment of employees' wages and other benefits required under this Agreement, including reasonable attorneys' fees incurred in enforcing the provisions hereof.

6.     Fringe Benefits.  The Employer agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the Health and Welfare Department of The Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund (including Laborers' Excess Benefit Funds), the Fox Valley Benefit Funds, the Construction and General Laborers' District Council of Chicago and Vicinity Apprentice and Training Trust Fund, the Chicago Area Laborers-Employers Cooperation Education Trust ("LECET"), and to all other designated Union-affiliated benefit and labor-management funds, and to become bound by and be considered a party to the Agreements and Declarations of Trust creating said Trust Funds as if it had signed the original copies of the Trust instruments and amendments thereto.  The Employer ratifies and confirms the appointment of the Employer Trustees who shall, together with their successor Trustees, carry out the terms and conditions of the Trust instruments.  The Employer further affirms that all prior contributions paid to the Welfare, Pension and Training Funds were made by duly authorized agents of the Employer at all proper rates, and evidence the Employer's intent to be bound

by the Trust Agreements and Collective Bargaining Agreements in effect when the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the Employer to the applicable agreements. Upon written notice to the Employer, the Union may increase the minimum surety bond to an amount not exceeding one hundred thousand dollars where necessary to ensure Employer compliance with its obligations.

Where Laborers covered by this Agreement perform work outside the Chicago area, the Employer shall, if covered under a local LIUNA-affiliated labor agreement in the area, contribute to the local fringe benefit funds in the amounts set forth in the local agreement. Otherwise, it shall remit all fringe benefit fund contributions in the amounts and to the funds as required under this Agreement.

7.     Wages and Industry Funds. The Employer shall pay all the negotiated hourly wages, fringe benefit and industry fund contributions it is bound to pay under the applicable Collective Bargaining Agreements, including, where applicable, contributions to the Chicago-Area LECET and designated labor-management and industry advancement funds, except that no contributions shall be made to MCIAF unless consented to and upon written direction from the Union. All additional wage rates, dues checkoff, and fringe benefits that are negotiated or become effective after May 31, 2006 shall be incorporated into this Agreement. The Union expressly reserves its sole right to allocate and apportion each annual total economic increase.

8.     Contract Enforcement. All grievances arising hereunder shall, at the Union's discretion, be submitted to the Chicago District Council Grievance Committee for final and binding disposition in lieu of another grievance committee. Should the Employer fail to comply within ten (10) days with any binding grievance award, whether by grievance committee or arbitration, it shall be liable for all costs and legal fees incurred by the Union to enforce the award. Notwithstanding anything to the contrary, nothing herein shall limit the Union's right to strike or withdraw its members because of non-payment of wages and/or fringe benefit contributions, failure by the Employer to timely remit dues to the Union, subcontracting in violation hereof, or non-compliance with a binding grievance award. The Employer's violation of any provision of this paragraph will give the Union the right to take any other lawful and economic action, including but not limited to all remedies at law or equity. It is expressly understood and agreed that the Union's right to take economic action is in addition to, and not in lieu of, its rights under the grievance procedures. Where necessary to correct contract violations, or where no acceptable steward is currently employed, the Union may appoint and place a steward from outside the workforce at all job sites.

9.     Successors. In the event of any change in the ownership, management or operation of the Employer's business or substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement. The Employer shall provide no less than ten (10) days prior written notice to the Union of the sale or transfer and shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph.

10.  Termination. This Agreement shall remain in full force and effect from June 1, 2006 (unless dated differently below) through May 31, 2010, and shall continue thereafter unless there has been given written notice, by certified mail by either party hereto, received no less than sixty (60) nor more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such notice the Employer and the Union agree to be bound by the new area-wide negotiated agreements with the applicable Associations incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated agreements, and thereafter for the duration of successive agreements, unless and until timely notice of termination is given as provided above.

11.  Execution. The Employer acknowledges and accepts the facsimile signatures on this contract as if they were the original signatures. The Employer further acknowledges receipt of a copy of the complete Joint Agreements.

Dated: JULY 21st , 20 06 .

ACCEPTED:

Laborers' Local Union No. 152

By: _____

CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL OF
CHICAGO AND VICINITY

By: _____
Frank Riley, President & Secy.-Treas.

By: _____
James P. Connolly, Business Manager

For Office Use Only:

CAICA
_____

CORPORATE CONSTRUCTION, INC
_____
(Employer)

FEIN No.: ███████████

By: LISA K. CALLAHAN / OWNER
(Print Name and Title)

x _____
(Signature)

802 SUNSET DR
(Address)

ROUND LAKE, IL 60073
(City, State and Zip Code)

847 740-8006 / 847 740-8898
(Telephone/Telefax)

Final 060306

Page 4 of 4

NOTES

---

JUNE 1, 2006 TO MAY 31, 2010

# BUILDING AGREEMENT

between the

CONCRETE CONTRACTORS ASSOCIATION
OF GREATER CHICAGO

and the

CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY

1



EXHIBIT
A-2

(d) The terms and conditions of this Agreement shall apply to all Bargaining Unit work performed by the Employer performing such work indirectly if such work is performed by any business entity controlled by the Employer, or if the Employer is a corporation, controlled by the person who controls the Employer.

(e) The Employer shall notify the Union of all non-signatory subcontractors prior to such subcontractors commencing work. Upon request of the Union, any subcontractor that fails to become signatory to the Union labor contract within 24 hours of the Union's request shall be removed from the job site.

(f) The Employer shall not be liable for the wages and fringe benefits owed by the subcontractor. However, should the Employer either fail to timely notify the Union of a non-signatory subcontractor, or fail to remove the non-signatory subcontractor within 24 hours upon the Union's request, the Employer shall pay to the Union, and its employees on the jobsite, an amount to equal to the difference between the subcontractor's aggregate wages and benefits and the amount set forth in this Agreement for the entire period that the subcontractor works with a Union agreement on the job site.

## Article VIII
## WAGES

Paragraph 1. The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2006 to and including May 31, 2010, shall be as set forth below for the respective following classifications as further defined herein.

The wage rates include an increase of $2.90 per hour effective June 1, 2006 to May 31, 2007 for a wage rate of $31.55 per hour which includes the dues deduction. June 1, 2007 to May 31, 2008, $3.00 per hour increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion. June 1, 2008 to May 31, 2009, $3.00 per hour increase to be

allocated between wages and fringe benefits by the Union in its sole discretion. June 1, 2009 to May 31, 2010, $3.10 per hour increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion.

## CLASSIFICATION

Employees shall receive the following hourly premiums in the classifications set forth below:

| Classification | Rate |
|---|---|
| Building Laborers | $0.00 |
| Fire Brick Work and Boiler Settler Laborers | $.325 |
| Jackhammerman (On Firebrick Work Only) | $.575 |
| Boiler Setter Plastic Laborers | $ .45 |
| Chimney Laborers (Over 40 Feet) | $ .10 |
| Chimney on Firebrick | $ .35 |
| Scaffold Laborers | $ .10 |
| Caisson Diggers | $ .35 |
| Jackhammerman | $.225 |
| Power Driven Concrete Saws, Other Power Equipment | $.225 |
| Stone Derrickman and Handlers | $ .20 |
| Fireproofing and Fire Shop Laborers | $ .00 |
| Well Point System Men | $ .35 |
| Pumps for Dewatering, other Unclassified Laborers | $0.00 |
| Windlass and Capstan Person | $ .15 |
| Cement Gun Nozzle Laborers (Gunite) | $ .15 |
| Cement Gun Laborers | $.075 |
| Plaster Laborers | $0.00 |
| Construction Specialist | $0.00 |

Sub-Foremen shall receive $.75 premium wages over and above top Laborers' Scale under his supervision.

Building Labor Foremen shall receive $1.50 premium wages over and above top Laborers' Scale under his supervision.

General Foremen shall receive $2.00 premium wages over and above top Laborers' Scale under his supervision.

Superintendents shall receive $3.00 premium wages over and above top Laborers' Scale under his supervision.

Dosimeter Use: A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument or measuring device.

Power Pac: When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

Asbestos Use: Regular rate shall apply. No premium shall be paid.

### Paragraph 2. APPRENTICE PROGRAM

**Section 1. APPRENTICE COMMITTEE:** The Employer hereby agrees that the Joint Apprenticeship Training Committee (JATC) shall have the authority to establish rules for the apprentice program, including penalties for violations of the apprenticeship rules, which are incorporated herein by reference. The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Apprentice and Training Fund, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of that fund pursuant to the Agreement and Declaration of Trust.

**Section 2. APPRENTICE PROGRAM FUNDING:** The apprenticeship program administered by the JATC shall be self sustaining. In addition to the sums set forth in Article IX, Paragraph 2 of the Agreement, effective

14

January 1, 1999, or on the date when the Association elects to participate in the program, whichever is later, the Employer shall also contribute to the Training Fund an additional contribution of five cents ($.05) per hour for each hour worked by all employees covered by this agreement, or a lesser amount as may be determined by the JATC. Effective June 1, 1999 and June 1, 2000, or on the date when the Association elects to participate in the program, whichever is later, the contribution shall be increased as determined by the JATC, but in no event shall the aggregate contributions under this paragraph 2 exceed five cents ($.05) over the term of this Agreement.

**Section 3.** The term of apprenticeship shall be 4,000 hours, or two years, whichever occurs later. All Health and Welfare, Pension, Training Fund, Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

**Section 4.** The wages per hour paid to apprentices shall be as follows:

| | |
|---|---|
| 1st six (6) months: | 60% of journeyman (base) wages |
| 2nd six (6) months: | 70% of journeyman (base) wages |
| 3rd six (6) months: | 80% of journeyman (base) wages |
| 4th six (6) months: | 90% of journeyman (base) wages |
| After 24 months: | 100% of journeyman (base) wages |

**Section 5.** The ratio of journeymen to Apprentices shall be six (6) laborer journeymen to one (1) laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of laborers being apprentices on any one job site of the Employer. Employers who employ a maximum of between one (1) and five (5) laborer journeymen shall be entitled to one (1) laborer apprentice, who may be assigned to job sites irrespective of the twenty percent (20%) job site maximum specified in this provision.

15

**Section 6.** Referral of apprentices will be through the Local Union with jurisdiction over the job site. All apprentices must be referred by the Local Union from approved JATC apprentices. Employers requesting apprentices will be assigned an apprentice from the available JATC apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program. Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 5. All apprentices must report their hours weekly to the JATC. All apprentices will be tested for the presence of illegal substances at the time they enter the apprentice program.

**Paragraph 3. WELFARE.** Beginning the period from June 1, 2006 to May 31, 2007, the Employer agrees to make Health and Welfare contributions of $7.46 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages herein stipulated. This $7.46 per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

That for the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009, June 1, 2009 to May 31, 2010; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training and other funds to be allocated from the economic package for that year. (See Article VIII, Paragraph 1)

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of that fund pursuant to the Agreements and Declarations of Trust.

**Paragraph 4. PENSION:** Beginning June 1, 2006 the Employer agrees to make a pension contribution of $4.84 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $4.84 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009, June 1, 2009 to May 31, 2010; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training and other funds to be allocated from the economic package for that year. (See Article VIII, Paragraph 1)

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of that fund pursuant to the Agreements and Declarations of Trust.

The parties agree that the Employer shall make lump sum contributions to employee fringe benefit accounts, administered by the Trustees on behalf of each employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of

the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees place the account in the hands of legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

Paragraph 5. Section 415 Excess Benefit Fund. A Section 415 Excess Benefit Fund shall be established for the purpose of providing alternative benefit to any employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Section 415 Excess Benefit Fund amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

Paragraph 6. SUPERVISORS: To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 3 and 4 of Article VIII of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management

Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 3 and 4 of Article VIII hereof.

Paragraph 7. Appointment of Trustees to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund. The parties agree that the Employer-appointed trustees of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund and training and apprentice funds to which Employers are required to contribute shall be appointed solely by Employer associations that enter into collective bargaining agreements with the Union requiring contributions to such funds ("Signatory Associations"). It is further agreed that the Trust Agreements establishing such funds shall be amended to replace any Employer association that appoints a trustee and does not have a labor agreement with the Union, replacing it with a Signatory Association. The union and Signatory Associations shall meet within 30 days of the effective dates of agreements covering a majority of Fund participants to review the appointment of Employer Trustees of the funds. It is agreed that the numbers of hours contributed by Employers represented by Signatory Association compared to contributions by other Signatory Associations during the preceding year shall be the basis for assigning the number of trustee appointments. If such parties are unable to agree on the Signatory Associations to be responsible for appointments and the number of appointments to be made by each Signatory Association the dispute shall be submitted to expedited arbitration under Subpart D of the Policies and Procedures of the Federal Mediation and Conciliation Service.

Paragraph 8. Article III Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of

Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time employees of Contributing Employers within the Association's membership. A Contributing Employer shall be defined as an Employer that has employed an average of five (5) or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

Paragraph 9. The Employer agrees to bound by the Agreements and Declarations of Trust, as well as amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter layoffs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

Paragraph 10. The Employer agrees to bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

Paragraph 11. Special Rules for Bonding. An employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond from a Fund-approved insurer in an amount equal to twice the amount of the other contributing employer's delinquency. This amount may be adjusted by the Benefit Fund Trustees for each individual employer. This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

**Paragraph 12. OUT OF TOWN WORK.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are asked to work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement.

## Article IX
## BONDING

All Employers shall procure, carry and maintain a surety bond in form and amount satisfactory to the Union, but not less than in the principal sum of $5,000.00, to guarantee payment of wages, Pension and Welfare Trust contributions, during the term of this Agreement.

The Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a) Formation of Partnerships;

(b) Termination of business;

(c) Change of name commonly used in business operation;

(d) Change in form of business organization;

(e) Incorporation of business;

(f) Dissolution of corporation;

(g) Name and business organization of successor;

(h) Admission to or withdrawal from any association or withdrawal from any association to or withdrawal from any associa- tion operating as a multi-Employer bargaining unit.

## Article X
## INDUSTRY FUND

**Paragraph 1.** Each Employer shall pay the amount of seven cents ($.07) for each hour worked by those employees covered under this Agreement to the CCA Industry Advancement Fund ("Industry Fund") and shall also pay the amount of six cents ($.06) for each hour worked by those employees covered under this Agreement to the Chicago-area Laborers-Employees Cooperation Education Trust ("LECET") and shall also pay the amount of twelve cents ($.12) for each hour worked by those employees covered under this Agreement to the Laborers' District Council Labor-Management Cooperation Committee ("LDC/LMCC").

**Paragraph 2.** The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Industry Fund, LECET, and the LDC/LMCC, and all amendments thereto, and agrees to be bound by all actions taken by the Trustees of those funds pursuant to the Agreement and Declaration of Trust of those funds.

**Paragraph 3.** Should any Employer fail to make payments to the Industry Fund, LECET Fund or LDC/LMCC, the Employer shall be liable for and pay, in addition to the delinquent contributions, interest at a rate of ten percent (10%) per year for such delinquencies, and to pay all costs of collection, including audit expenses and attorney fees and costs.

# RESTATED AGREEMENT

AND

# DECLARATION OF TRUST

CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002


EXHIBIT
A-3

(b)    To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)    To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

Section I.    IN GENERAL.  In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work. No

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process. including court fees. audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees. on demand. the names of its employees, their social security numbers, the hours worked by each employee, and such

-27-

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

### FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.    FILING OF A CLAIM.    Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

# ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers.** New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers.** Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

2

## AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## CREATING LABORERS' PENSION FUND

WHEREAS, Article XII of the Restated Agreement and Declaration of Trust ("Trust Agreement") of the Laborer's Pension Fund (the "Fund") provides that the Board of Trustees have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching

1

themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

<u>I.</u>

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

<u>II.</u>

The following is added as Section (4) to Article VII, "Funding Pension Plan Benefits":

"<u>Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.</u>

(a)    <u>EMPLOYER OWNED BY DEADBEAT EMPLOYER.</u>  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    <u>EMPLOYER OPERATED BY DEADBEAT EMPLOYER.</u>  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c) <u>PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.</u> The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d) <u>MISCELLANEOUS PROVISIONS.</u> The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

III.

<u>Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.</u>

3

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

**CHARLES COHEN**  9-18-06  DATE          **JOSEPH COCONATO**  9/18/06  DATE

**ALAN ESCHE**  9/18/06  DATE          **JAMES P. CONNOLLY**  9/18/06  DATE

**ROBERT G. KRUG**  9/18/06  DATE          **J. MICHAEL LAZZARETTO**  9/18/06  DATE

**RICHARD E. GRABOWSKI**  9/18/06  DATE          **FRANK RILEY**  9/18/06  DATE

**DAVID H. LORIG**  9/18/06  DATE          **LARRY WRIGHT**  9/18/06  DATE

**GARY LUNDSBERG**  9/18/06  DATE          **JEFF ZIEMANN**  9-18-06  DATE

4

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003

1


EXHIBIT

tabbies®

A-4

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1. IN GENERAL. In order to fund the Benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.  Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.  Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.  Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.  Cash disbursement journals and general ledgers.

5.  Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6.  Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.  Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.  Daily time records filed by employees or supervisors.

9.  Source documents and lists of job codes and equipment codes.

10.  Certified payrolls for public sector jobs where such payrolls are required.

11.  Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers.** New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers.** Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

1

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

## AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND
## GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

WHEREAS, Article XI of the Restated Agreement and Declaration of Trust ("Trust Agreement") provides that the Board of Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Fund") have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

1

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

I.

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A 'Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

II.

The following is added as Section (4) to Article VI, "Employer Contributions":

"Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)     EMPLOYER OWNED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)     EMPLOYER OPERATED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)     PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION. The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)     MISCELLANEOUS PROVISIONS. The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

III.

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

3

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

CHARLES J. GALLAGHER          DATE

ALAN ESCHE          DATE  9/19/06

RICHARD E. GRABOWSKI          DATE  9/19/06

DAVID H. LORIG          DATE  9/19/06

DENNIS MARTIN          DATE  9/19/06

TIM J. SCULLY          DATE  9/19/06

JAMES P. CONNOLLY          DATE  9/19/06

RANDY DALTON          DATE  9/19/06

MARTIN FLANAGAN          DATE  9-19-06

LIBERATO NAIMOLI          DATE  9/19/06

SCOTT PAVLIS          DATE  9/19/06

FRANK RILEY          DATE  9/19/06

4

AGREEMENT AND DECLARATION OF TRUST
ESTABLISHING
THE CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY
TRAINING TRUST FUND

THIS AGREEMENT AND DECLARATION OF TRUST, made and entered into as of the 1st day of June, 1986 by and between THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, A.F.L.-C.I.O., representing its affilated Local Unions and the members thereof (the "Council") and the BUILDERS' ASSOCIATION OF CHICAGO, the UNDERGROUND CONTRACTORS ASSOCIATION, and the ILLINOIS ROAD BUILDERS' ASSOCIATION, and all other employer associations (the "Associations") who have hereto bargained or may hereafter bargain or enter into collective bargaining agreements or other agreements with the Union, its local affiliates, or with representatives of this Trust, for and on behalf of themselves and their respective members who by virtue of their said membership or otherwise are parties to collective bargaining agreements with the Union or any of its local affiliates or are parties to this Agreement or are otherwise bound to the provisions hereof as hereinafter provided, and other employers in the building and construction industry who may not be members of any association but who are included in the term "Employers" (as defined in Section 2 of ARTICLE I) and agree to be bound by this Agreement or who are otherwise so bound as provided as set forth in Section 2 of ARTICLE I;

WITNESSETH:

(1) The Employers are parties to a collective bargaining agreement, or supplements thereto, with the Council which requires

-1-

EXHIBIT
A-5

Employer contributions of a certain sum per hour per Employee to a training fund provided in a program to be created for participating employees and established by this trust agreement.

(2) the parties have agreed that such contributions shall be payable to and be deposited in the Trust Fund created and established by this Trust Agreement.

NOW, THEREFORE, in consideration of the premises and in order to establish and provide for the maintenance of said Trust Fund to be known as "THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND" hereinafter referred to as the "Trust Fund," it is mutually understood and agreed as follows.

## ARTICLE I

### Definitions

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Trust Agreement.

### Section 1. WRITTEN AGREEMENT

The term "Written Agreement" shall mean any agreement in writing which specifies the detailed basis on which contributions shall be made to this Trust together with any modification, amendment or renewals thereof, including but not limited to Collective Bargaining Agreements, memoranda of understanding which incorporate by reference Collective Bargaining Agreements or this Agreement, report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this Agreement, or any other agreement obligating the Employer signatory thereto to participate in or be bound by this Agreement.

signatory association, nor any officers, agent, employee or committee member of the Employers, or of any signatory association shall be liable to make contributions to the Fund or be under any other liability to the Fund or with respect to the Training Program, except to the extent that he may be an individual Employer required to make contributions to the Fund with respect to his or its own individual or joint venture operations, or to the extent he may incur liability as a Trustee, as hereinafter provided. The liability of any individual Employer to the Fund, or with respect to the Training Program shall be limited to the payments required by any written agreement with respect to his or its individual or joint venture operations, and in no event shall he or it be liable or responsible for any portion of the contributions due from other individual Employers with respect to the operations of such Employers. The individual Employers shall not be required to make any further payments or contributions to the cost of the operations of the Fund or of the Training Program, except as provided in Section 8 of this Article.

Section 6. Neither the Employers, any signatory association, any individual Employer, the Council, nor any employee shall be liable or responsible for any debts, liabilities or obligations of the Fund or the Trustees.

Section 7. Contributions to the Fund shall be due and payable to the principal office of the Fund and shall be made in regular monthly installments except as otherwise herein provided in Section 9 of this Article II. Each contribution to the Fund shall be made promptly, and in any event on or before the 10th day

of the calendar month in which it becomes due and payable. Each monthly contribution shall include all payments which have accrued in the interim for work performed up to the close of the Employer's payroll period ending closest to the last day of the preceding calendar month. Each monthly contribution shall be accompanied by a report in a form prescribed by the Board of Trustees.

Section 8. The parties recognize and acknowledge that the regular and prompt payment of Employer contributions and reports to the Fund are essential to the maintenance of the Fund and that it would be extremely difficult, if not, impracticable, to fix the actual expense and damage to the Fund and to the Training Program which would result from the failure of an Employer to pay such monthly contributions in full within the time provided above. Therefore, if any Employer is delinquent in remitting its contributions within the time specified in Section 7 of this Article, the amount of damage to the Fund and Training Program resulting from failure to make reports or pay contributions within the time above specified shall be presumed to be the sum of ten percent (10%) of the amount of the contribution due for each delinquent report or contribution. This amount shall be added as liquidated damages upon the day immediately following the date on which the report or the contribution or contributions become delinquent. Delinquent contributions and penalties shall also bear interest at a rate up to the prime rate of interest as recognized by the First National Bank of Chicago or such other lawful amount as determined by the Trustees from the due date until

delinquency is totally satisfied. The Trustees, however, in their discretion, for good cause (Trustees shall have sole right to determine what shall constitute good cause) shall have the right and power to waive all or any part of any sums due the Fund as liquidated damages. Failure by any Employer to make the required payments hereunder shall be deemed a breach of the written agreement by the Employer and be subject to economic action by the Council in addition to the other remedies as provided herein. The Trustees may, at their option, also take legal action to collect all delinquent amounts owing to the Fund, and parties agree that if the delinquent account of any Employer is referred to an attorney for collection, such Employer shall immediately become liable for a reasonable sum for the attorneys' fee together with an amount equal to all costs incurred by the Trustees in commencing or prosecuting legal action in any Court. In such legal action, venue shall be laid at Cook County, Illinois, as the Fund is administered in such county.

Section 9. In the case of certain Employers who have defaulted on payments in the past, or who otherwise give the Trustees reasonable cause to feel insecure as to future contributions, the Trustees shall have the power to require a bond for the payment of contributions.

ARTICLE III

Board of Trustees

Section 1. Except as otherwise specifically provided, the Fund shall be operated and administered by a Board of Trustees whose membership shall consist of three persons appointed as trustees by the Association (known as the "Association Appointed

CORPORATE CONSTRUCTION, INC.
P.O. BOX 407
LAKE VILLA, IL 60046

EMPLOYER #34585

JANUARY 1, 2007 – DECEMBER 31, 2009



EXHIBIT
A-6

# BANSLEY AND KIENER, L.L.P.

## CERTIFIED PUBLIC ACCOUNTANTS

O'HARE PLAZA
8745 WEST HIGGINS ROAD, SUITE 200
CHICAGO, ILLINOIS 60631
AREA CODE 312 263.2700

April 5, 2011

Board of Trustees
Pension and Welfare Funds of Construction and General
    Laborers' District Council of Chicago and Vicinity
11465 Cermak Rd.
Westchester, IL 60154

We have applied certain procedures, as discussed below, to the payroll records of Corporate Construction, Inc., a contributing employer to the Pension and Welfare Funds of Construction and General Laborers' District Council of Chicago and Vicinity, for the period January 1, 2007 to December 31, 2009. The purpose of our review was to assist you in determining whether contributions to the Trust Funds are being made in accordance with the collective bargaining agreement in effect and with the Trust Agreement of the Fund. The propriety of the contributions is the responsibility of the employer's management.

Our procedures generally include a review of the pertinent provisions of the collective bargaining agreements and comparing underlying employer payroll records to Fund contribution records. The employer records we review may include payroll journals, individual earnings records, payroll tax returns, contribution reports, job classifications, and general disbursement records. The scope of this engagement is limited to records made available by the employer and would not necessarily disclose all exceptions in employer contributions to the Trust Fund. Any compensation paid to employees not disclosed to us or made part of the written record is not determinable by us and is not included in our review.

Our procedures relate to a review of the employer's payroll records only and do not extend to any financial statements of the contributing employer. The procedures were substantially less in scope than an audit of the financial statements of the contributing employer, the objective of which is the expression of an opinion on the contributing employer's financial statements. Accordingly, no such opinion is expressed.

There were no exceptions to employer contributions.

*Bansley and Kiener, L.L.P.*

BANSLEY and KIENER, L.L.P.
Certified Public Accountants

**BANSLEY & KIENER, L.L.P.**
**PAYROLL AUDIT INFORMATION SHEET**

| | | | |
|---|---|---|---|
| EMPLOYER'S NAME | CORPORATE CONSTRUCTION, INC. | EMPLOYER # | 34585 |
| ADDRESS | P.O. BOX 407 | PHONE # | 847-740-8006 |
| CITY/STATE/ZIP | LAKE VILLA, IL 60046 | FEIN # | N/A |
| DATE OF CONTACT | JANUARY 29, 2010 | AUDIT PERIOD | 1/1/07 - 12/31/09 |
| CONTACT'S NAME | LISA CALLAHAN | TITLE | PRESIDENT |
| PERSON FUND IS TO CONTACT | SAME AS ABOVE | TITLE | SAME AS ABOVE |
| ENTITY TYPE | CORPORATION | # OF EMP./AVG. | 0 / 5 |
| BUSINESS ACTIVITY | CONSTRUCTION | | |

| OWNERSHIP-PRINCIPALS | TITLE | % | ADDRESS |
|---|---|---|---|
| LISA CALLAHAN | PRESIDENT | N/A | |

BANKING FACILITIES USED AND ACCOUNT NO.          NORSTATES BANK

DOES EMPLOYER HAVE INTEREST IN OTHER OPERATIONS?

☐YES   ☐NO

IF YES, LIST NAMES OF SAME   N/A

IS EMPLOYER A MEMBER OF ANY TRADE ORGANIZATION/ASSOCIATION?

☐YES   ☐NO

IF YES, LIST NAMES OF SAME   N/A

**BANSLEY & KIENER, L.L.P.**
**PAYROLL AUDIT INFORMATION SHEET**

AUDIT DATE                                    N/A

AUDIT SITE (IF DIFFERENT FROM EMPLOYER'S ADDRESS):          BANSLEY & KIENER, L.L.P.

CHICAGO, IL 60631

ALL REQUIRED ACCOUNTING RECORDS WERE AVAILABLE WITH THE EXCEPTION OF:          THE ONLY RECORDS

PROVIDED WERE BANK STATEMENTS AND CANCELLED CHECKS.

BRIEFLY DESCRIBE THE NATURE OF THE DELINQUENCY, IF ANY:          N/A

DID YOUR EXAMINATION UNCOVER ANYTHING SPECIAL OR UNUSUAL WHICH SHOULD BE BROUGHT TO THE
ATTENTION OF THE FUND COUNSEL OR OTHER INTERESTED PERSONS?

☐ YES          ☒ NO

IF YES, EXPLAIN:          N/A

AUDITOR:          DANIEL TIMM

Ms. Jean Mashos
Director, Field Department
Chicago Laborers' Pension and Welfare Funds
11465 Cermak Road
Westchester, Illinois 60154

---

For professional services rendered:

Payroll compliance review and preparation of report for the period January 1, 2007 through December 31, 2009.

| Employer | Amount |
|---|---|
| Corporate Construction, Inc. - #34585 | $912.25 |
| Less: previously billed and paid | (752.50) |
| Net amount due | $159.75 |


EXHIBIT
A-7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )     **Case No. 09 CV 1234**
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )     **Judge Hart**
    )
           **Plaintiffs,** )
   **v.** )
    )
**CORPORATE CONSTRUCTION, INC., an** )
**Illinois Corporation** )
    )
           **Defendants.** )

## DECLARATION OF JOHN HAMADA

I, JOHN HAMADA, declare and state as follows:

1.     I am Fund Counsel for Plaintiffs Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (the "Laborers' Funds"), Plaintiffs in the above-referenced action. This Declaration is submitted in support of the Laborers' Funds' Motion for Entry of Judgment in Sum Certain against Defendant Corporate Construction, Inc.

2.     Shareholders of the law firms of Allison, Slutsky & Kennedy, out-of-house collection counsel for the Laborers' Funds billed the Laborers' Funds at a rate of $175.00 per hour, and beginning May 15, 2009 at a rate of $200.00 per hour. Affiant, as in-house counsel for the Funds has first-hand knowledge that the hourly rate of $175.00 has been found reasonable and has been awarded by many courts in collection proceedings, and that the increase to a



$200.00 hourly rate is a reasonable rate compared with attorney hourly rates in the Northern District.

3.      John Hamada, in-house counsel for the Chicago Funds, received a Bachelor of Arts Degree from University of Illinois at Urbana-Champaign in 2000 and a Juris Doctor from Chicago-Kent College of Law in 2006. I was admitted to the bar of the State of Illinois in November of 2006 and to the bar of the United States District Court for the Northern District in January of 2007. In February of 2009, I became in-house counsel for the Laborers' Funds.

4.      Based on the foregoing, $175.00, represents a fair and reasonable market rate for my in-house legal services to the Funds in this matter.

5.      Patrick T. Wallace received a Bachelor of Arts Degree from the University of Illinois at Urbana-Champaign in 1992 and a Juris Doctor Degree from the University of DePaul College of Law in 1995. He was admitted to the bar of the State of Illinois in November 1995 and to the bar of the United States District Court for the Northern District of Illinois in December 1995. He has also been admitted to the bar of the United States District Court for the Central District of Illinois. He was admitted to the Trial Bar of the Northern District of Illinois on September 20, 2000. From November 1995 to August 2000 he practiced labor and employment law as an associate at the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson (formerly Katz, Friedman, Schur & Eagle). In September 2000, he became Funds Counsel for the Laborers' Pension Fund and Laborers' Welfare Fund for the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity.

6.      Based on the foregoing, $200.00 represents a fair and reasonable market rate for Patrick T. Wallace's in-house legal services to the Funds in this matter.

7.    Jerrod Olszewski, in-house counsel for the Chicago Funds, received a Bachelor of Arts Degree from Benedictine University in 1993 and a Juris Doctor Degree from the John Marshall Law School in 2002. He was admitted to the bar of the State of Illinois in May, 2002, and to the bar of the United States District Court for the Northern District of Illinois in May, 2002. From May, 2002 to December, 2004, he practiced labor and employment law as an associate at the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson, former out-of-house counsel to the Laborers' Funds, with the majority of my work being spent representing the Laborers' Funds. In December, 2004, he became in-house counsel for the Funds.

8.    Based on the foregoing, $200.00 represents a fair and reasonable market rate for Jerrod Olszewski's in-house legal services to the Funds in this matter.

9.    Exhibit B-1 attached hereto sets forth the time expended to date by in-house counsel on this matter. As set forth in that Exhibit, in-house has expended 36.60 hours totaling $6,300.00 in attorneys' fees and $540.80 in costs totaling $6,840.80.

I, the undersigned, certify under penalty of perjury that the foregoing is true and correct.

Date: 4/18/2011                                    _____
                                                    John Hamada

3

Laborers Pension and Welfare Funds
11465 Cermak Rd.
Westchester, IL 60154


Invoice submitted to:
Corporate Construction #2




April 12, 2011


Invoice #10092


        Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 2/24/2009 | JH | Complaint | 1.40 150.00/hr | 210.00 |
| | PTW | Conference with JH re: new suit. | 0.50 175.00/hr | 87.50 |
| 2/25/2009 | JH | Complaint | 0.30 150.00/hr | 45.00 |
| | JH | Review Complaint and filing preparation | 0.80 150.00/hr | 120.00 |
| 2/26/2009 | JH | File Complaint with YB, draft District Counsel Ltr to Locals | 0.90 150.00/hr | 135.00 |
| 3/3/2009 | PGL | Ltr to JAS re; service of summons and complaint | 0.10 75.00/hr | 7.50 |
| 4/8/2009 | JH | Research company location for service, review with PTW | 0.40 150.00/hr | 60.00 |
| 5/28/2009 | JH | Court Appearance, status and status notes. Letter to Callahan, Telephone conference with Joe Gilleran | 1.00 175.00/hr | 175.00 |
| 6/9/2009 | JH | Voicemail, file review, Motion for Order of Default and to Compel an Audit | 0.30 175.00/hr | 52.50 |
| 6/11/2009 | JH | Court status | 0.60 175.00/hr | 105.00 |


EXHIBIT B-1

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 6/12/2009 JH | Draft MOD | 0.60<br>175.00/hr | 105.00 |
| 6/16/2009 JH | Letter to L. Callahan, voicemail L. Callahan | 0.50<br>175.00/hr | 87.50 |
| 6/24/2009 JH | Telephone conference with  J. Gillran, Motion for Order of Default and to Compel an Audit draft, preparation for filling, voicemail Callahan | 1.50<br>175.00/hr | 262.50 |
| 6/25/2009 JO | Telephone conference with  Judge Harts clerk Carol Wing re: striking status | 0.10<br>175.00/hr | 17.50 |
| 7/8/2009 JH | Review file | 0.30<br>175.00/hr | 52.50 |
| 7/9/2009 JH | Motion for Order of Default and to Compel an Audit, Court update status notes, letter to L. Callahan | 1.00<br>175.00/hr | 175.00 |
| 7/10/2009 JH | Voicemail L. Callahan | 0.10<br>175.00/hr | 17.50 |
| 7/21/2009 JH | Telephone conference with  S. Kadison | 0.20<br>175.00/hr | 35.00 |
| 8/3/2009 JH | Lexis Search L. Callahan; Voicemail L. Callahan | 1.00<br>175.00/hr | 175.00 |
| 8/20/2009 JH | Voicemail J. Cassidy; Lexis Search | 1.00<br>175.00/hr | 175.00 |
| 10/29/2009 JH | Motion Rule to Show Cause; Court | 0.70<br>175.00/hr | 122.50 |
| 11/6/2009 JH | Telephone conference with  MJ Valdez Clerk; Review File | 0.40<br>175.00/hr | 70.00 |
| 12/3/2009 JH | Lexis search; Lisa Callahan and Corporate Construction | 1.50<br>175.00/hr | 262.50 |
| 1/12/2010 JH | Court RSC; Update status notes; Voicemail Lisa Callahan | 1.30<br>175.00/hr | 227.50 |
| 1/27/2010 JH | Letter to D. Timm and BK | 0.40<br>175.00/hr | 70.00 |
| 1/28/2010 JH | Email L. Callahan | 0.30<br>175.00/hr | 52.50 |
| 1/29/2010 JH | Telephone conference with  Rachel Patterson | 0.20<br>175.00/hr | 35.00 |

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 2/17/2010 | JH | Email L. Callahan; Telephone conference with  R. Patterson | 0.50 175.00/hr | 87.50 |
| 2/22/2010 | JH | Voicemail Rachel Patterson; Telephone conference with  R. Patterson | 0.40 175.00/hr | 70.00 |
| 2/23/2010 | JH | Telephone conference with  R. Patterson | 0.20 175.00/hr | 35.00 |
| 2/24/2010 | JH | Draft Subpoena | 0.30 175.00/hr | 52.50 |
| 7/9/2010 | JH | Telephone conference with  L. Callahan; Telephone conference with  D. Timm; Review file | 1.00 175.00/hr | 175.00 |
| 7/27/2010 | JH | Review spreadsheets and research contact info; Conference with JO; Conference with PTW; Email L. Callahan | 1.50 175.00/hr | 262.50 |
| 8/17/2010 | JH | Review documents; Research Vela Concrete | 0.50 175.00/hr | 87.50 |
| 8/23/2010 | JH | Review spreadsheets | 0.20 175.00/hr | 35.00 |
| 9/1/2010 | JH | Voicemail L. Callahan; Email | 0.20 175.00/hr | 35.00 |
| 9/3/2010 | JH | Voicemail L. Callahan | 0.10 175.00/hr | 17.50 |
| 9/9/2010 | JH | Court Status; Voicemail L. Callahan; Email; Conference with CK | 1.00 175.00/hr | 175.00 |
| 10/8/2010 | JH | Telephone conference with  D. Timm | 0.20 175.00/hr | 35.00 |
| 10/12/2010 | JH | Conference with JO; Voicemail L. Callahan | 0.40 175.00/hr | 70.00 |
| 10/21/2010 | JH | Review bank records | 0.30 175.00/hr | 52.50 |
| 10/22/2010 | JH | Email Lisa Callahan; Draft letter | 0.50 175.00/hr | 87.50 |
| 10/25/2010 | JH | Notice of Dep | 0.50 175.00/hr | 87.50 |
| 10/29/2010 | JH | Email Lisa Callahan | 0.30 175.00/hr | 52.50 |

|            |    |                                                                                    | Hrs/Rate | Amount |
|------------|----|------------------------------------------------------------------------------------|----------|--------|
| 11/12/2010 | JH | Telephone conference with  C. Wing; Email L. Callahan                               | 0.20 175.00/hr | 35.00 |
| 11/29/2010 | JH | Review file                                                                        | 0.30 175.00/hr | 52.50 |
| 12/21/2010 | JH | Prep for Deposition; Telephone conference with  L. Callahan                        | 0.50 175.00/hr | 87.50 |
| 12/27/2010 | JH | Prep for CDA                                                                        | 0.40 175.00/hr | 70.00 |
| 1/4/2011   | JH | Dep. Prep; Email L. Callahan; Telephone conference with  L Callahan                | 0.60 175.00/hr | 105.00 |
| 1/5/2011   | JH | Deposition of L. Callahan; Draft Affidavits                                        | 3.50 175.00/hr | 612.50 |
|            | JH | Deposition; Prer & Deposition                                                      | 3.00 175.00/hr | 525.00 |
| 1/6/2011   | JH | Draft affidavits; Telephone conference with  D. Timm                              | 1.00 175.00/hr | 175.00 |
| 1/21/2011  | JH | Email L. Callahan                                                                  | 0.20 175.00/hr | 35.00 |
| 2/3/2011   | JH | Telephone conference with  D. Timm                                                 | 0.20 175.00/hr | 35.00 |
| 2/7/2011   | JH | Telephone conference with  D. Timm; Telephone conference with  L. Callahan         | 0.50 175.00/hr | 87.50 |
| 3/15/2011  | JH | Draft Affidavits                                                                   | 0.40 175.00/hr | 70.00 |
| 3/17/2011  | JH | Telephone conference with  D. Timm                                                 | 0.10 175.00/hr | 17.50 |
| 3/23/2011  | JH | Telephone conference with  D. Timm                                                 | 0.20 175.00/hr | 35.00 |
|            |    | For professional services rendered                                                 | 36.60    | $6,300.00 |
|            |    | Additional Charges :                                                               |          |        |
| 2/26/2009  |    | Filing fee.                                                                        |          | 350.00 |
| 4/8/2009   |    | Attempted service of Summons and Complaint.                                        |          | 75.00  |

|  | | Amount |
|---|---|---:|
| 4/21/2009 | Affidavit of Compliance filing fee. | 10.80 |
| 12/7/2009 | Service of process. | 105.00 |
| | Total additional charges | $540.80 |
| | Total amount of this bill | $6,840.80 |
| | Balance due | $6,840.80 |

## Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---:|---:|---:|
| Jerrod Olszewski | 0.10 | 175.00 | $17.50 |
| John Hamada | 32.10 | 175.00 | $5,617.50 |
| John Hamada | 3.80 | 150.00 | $570.00 |
| Paralegal | 0.10 | 75.00 | $7.50 |
| Patrick T. Wallace | 0.50 | 175.00 | $87.50 |

## CERTIFICATE OF SERVICE

The undersigned attorney of record certifies that she caused a copy of the foregoing Motion for Entry of Default Judgment and proposed Order to be served upon the following person via U.S. First Class Mail, postage prepaid on this 7th day of March, 2011.

Corporate Construction, Inc.
c/o Lisa K. Callahan, President
802 Sunset Avenue
Round Lake, IL 60073

Corporate Construction, Inc.
c/o Lisa K. Callahan, President
P.O. Box 407
Lake Villa, IL 60046-0407

/s/ John Hamada